2011 VT 47

**Pamela LENOCI, Administratrix of the Estate of Alexandra Brown v. Kayla LEONARD**

[21 A.3d 694]

No. 10-163

¶ 1. April 21, 2011. This case asks the Court to decide if an eighteen-year-old has a duty to control the behavior of a fifteen-year-old friend and, if the fifteen-year-old later commits suicide, whether the eighteen-year-old is at fault. We affirm the trial court's grant of summary judgment to defendant and conclude she had no duty to intervene to prevent the tragedy that occurred.

¶ 2. Alexandra Brown was fifteen years old when she committed suicide in the early morning of February 21, 2007. Two nights before, on February 19, she and eighteen-year-old Kayla Leonard, defendant, had decided to go to a party at an acquaintance's apartment. Each girl had lied to her parents, telling them that she was sleeping over at the other's house. Kayla picked Alex up at her home and drove them both to the apartment. There the girls danced and drank alcohol Alex provided. Kayla was concerned some of the young men at the party might "take advantage" of Alex, and at one point she stopped Alex from dancing inappropriately. Ultimately, the girls spent the night, sharing a room with a nineteen-year-old man who lived in the apartment. During the night Alex had sexual intercourse with the nineteen-year-old. Kayla was aware the two were intimate but did not know they had intercourse.

¶ 3. Kayla drove Alex home the next morning. Alex had made plans to return to the nineteen-year-old man's apartment. She got her stepfather's permission to spend the night at another girl's house. Her stepfather became suspicious, however, when he saw Alex leave the house, walk down the driveway to a car, and drive away. He called Alex's mother, who was in Florida at the time, and told her of his suspicions. Alex's mother called the girl's house and found out that there were no plans for Alex to spend the night. She then called Alex's cell phone and left a message confronting Alex with her deceit. The State Police were called. One officer called Alex's cell phone twice and asked her to simply get in touch with either him or her mother to let them know she was all right. Alex's mother called several more times and left messages, including one that threatened "massive, massive consequences" because of Alex's behavior.

¶ 4. Throughout the night, while driving around Rutland with a friend and later alone at her house, Alex sent numerous text messages to her friends telling them she had been caught by her parents and describing the trouble she was in. She also sent numerous text messages to her boyfriend, who was away at college, one of which said, "I got caught tonight. I'm grounded forever. Goodbye." Alex also spoke with her boyfriend by phone and admitted that she had gotten drunk the night before. Later, she left her boyfriend a voicemail on his cell phone in which she admitted to having sex with the nineteen-year-old. While she mentioned suicide in some of her text messages, she never sent Kayla such a message.

¶ 5. At some point in the evening, back at her house, Alex composed a suicide note. In it, she lamented having had sex

with the nineteen-year-old and said that she felt her boyfriend hated her and that she hated herself. She also expressed love for her boyfriend. Approximately one week beforehand, she and her boyfriend had a fight over the phone during which she told him that she felt like committing suicide and that she had even decided how she would take her life. On this night, after writing the suicide note, Alex carried out the plan she had discussed and hanged herself from a tree in her yard. Her body was discovered by a neighbor the next morning.

¶ 6. Plaintiff, Alex's mother acting as administrator of her estate, sued Kayla alleging that Kayla was negligent for bringing Alex to the apartment party, that Kayla should have intervened to prevent Alex from having sexual intercourse with the nineteen-year-old, and that, because she failed to do so, Kayla negligently caused Alex to suffer emotional harm. Plaintiff further claimed that Kayla's negligence caused a delirium or insanity in Alex and "as a proximate result thereof, she committed suicide." Kayla moved for summary judgment arguing that she owed no duty to Alex and that her actions were not the proximate cause of Alex's suicide. The trial court granted Kayla's motion, and from that decision plaintiff appeals.

¶ 7. Plaintiff contends the trial court erred in finding Kayla did not owe Alex a duty. She suggests such a duty arose when Kayla, an eighteen-year-old, brought Alex, a minor, to a party with alcohol and adults present and recognized, or should have recognized, the "unreasonable risk of sexual assault" Alex faced. Plaintiff further argues that there was ample evidence supporting her theory that Kayla's negligence caused Alex's death and emotional distress and summary judgment was therefore premature. We affirm the trial court, holding that Vermont law does not recognize the duty sought under these circumstances.

We additionally address the trial court's holding that Alex's suicide broke any causal connection to Kayla's actions.

¶ 8. Our standard for reviewing a grant of summary judgment is well rehearsed: we apply the same standard as the trial court, affording its decision no deference. *Myers v. Langlois*, 168 Vt. 432, 434, 721 A.2d 129, 130 (1998). Accordingly, we will affirm if there is no genuine issue of material fact and the prevailing party is entitled to judgment as a matter of law. V.R.C.P. 56(c)(3).

¶ 9. Under our criminal code, a fifteen-year-old is incapable of having consensual sex with a nineteen-year-old unless the two are married. See 13 V.S.A. § 3252(c). Similarly, a highly intoxicated person cannot be said to consent to having sex. See *id.* § 3254(2). However, this is a civil case, and the question for the Court is one of duty. To support a negligence claim, a plaintiff must show that the defendant owed her a legal duty, that the defendant breached that duty, that the breach was the proximate cause of the plaintiff's injury, and that she suffered actual loss or damage. *Endres v. Endres*, 2008 VT 124, ¶ 11, 185 Vt. 63, 968 A.2d 336. Thus to maintain either her wrongful death or negligent-infliction-of-emotional-distress claim — both of which sound in negligence — plaintiff must establish that Kayla owed Alex a duty. The existence of duty is a question of law. *Edson v. Barre Supervisory Union #61*, 2007 VT 62, ¶ 9, 182 Vt. 157, 933 A.2d 200. Absent a duty of care, an action for negligence fails. *Rubin v. Town of Poultney*, 168 Vt. 624, 625, 721 A.2d 504, 506 (1998) (mem.).

¶ 10. Plaintiff argues that Kayla owed a duty to Alex to prevent the sexual intercourse that occurred. She relies on several theories to support her claim. First, she argues that once Kayla observed the drinking and licentious behavior at the apartment party, she should have realized she had exposed Alex to an unreasonably risky situation by bringing her to the

apartment. Plaintiff relies on the principle that "[i]f the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect," even if at the time of acting, "the actor has no reason to believe that it will involve such a risk." Restatement (Second) of Torts § 321 (1965).

¶ 11. It cannot be said that Kayla, by driving Alex to the apartment and witnessing her conduct while there, created a risk that Alex would have sexual intercourse that night. Both girls had decided to go to the apartment, and Alex chose to engage in certain behavior while there. There was no suggestion that Alex was not there voluntarily or that her behaviors were coerced or that Kayla somehow accepted responsibility for Alex upon picking her up or watching out for her while there. Mere presence at the apartment, moreover, did not result in Alex and the nineteen-year-old's interaction. Alex made her own choices that night, and Kayla did not create a potentially dangerous situation such that she had a duty to prevent harm to Alex.

¶ 12. Plaintiff essentially advocates that we find a duty simply because one girl was eighteen and the other was fifteen. The law does not impose such a duty in this situation — a duty for an eighteen-year-old to protect a high school friend who has not reached the age of majority from the consequences of the younger person's independent behavior or to control such behavior. See Restatement (Second) of Torts § 314 ("The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."). The consequences to the community should such a duty be found would be considerable, transforming every high school friendship at the moment one friend turns eighteen into an in loco parentis relationship. Plaintiff has made no convincing argument that Kayla was somehow in a position to control Alex's behavior that night by virtue of the less-than-three-year difference in their ages.

¶ 13. Plaintiff alternately contends that we should evaluate the factors set out in *Langle v. Kurkul* as part of our analysis of whether any duty existed. 146 Vt. 513, 510 A.2d 1301 (1986). In *Langle*, through a discussion of decisions from other states, we identified a number of factors to consider in determining whether a duty exists. *Id.* at 519, 510 A.2d at 1305. We noted that foreseeability of the risk is often a primary consideration. *Id.* Other factors include:

> the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

*Id.* (quotation omitted). In this case, none of these considerations supports a finding of duty on the part of Kayla.

¶ 14. We have recognized that "[a]ctionable negligence is made out only when it appears that a prudent person, in like circumstances, would have thought that injury would be likely to result" from the acts or omissions in question. *LaFaso v. LaFaso*, 126 Vt. 90, 93, 223 A.2d 814, 817 (1966). The only suggestion that Alex suffered an injury as a result of her liaison with the nineteen-year-old was the expression of regret found in her suicide note. To argue that Kayla could or should

have anticipated Alex would suffer emotional distress as a result of the intercourse requires too much speculation and does not satisfy the need that the claimed injury be reasonably foreseeable. If it was only on subsequent reflection that Alex regretted her choices, it cannot be reasonable to expect Kayla to have anticipated same. "Foresight of harm lies at the foundation of negligence." *Id.* at 94, 223 A.2d at 818 (quotation omitted).

¶ 15. In passing, plaintiff suggests Kayla had a duty to protect Alex because the two had a special relationship, but she presents no argument on this issue beyond stating that she raised it below. A special relationship may arise between two people, such as between a parent and child or custodian and ward. Cf. Restatement (Second) of Torts § 314A(4) ("One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other."). When such a relationship exists, it may impose a duty on one party to take affirmative action or precautions for the aid or protection of the other. See *Peck v. Counseling Serv. of Addison Cnty., Inc.*, 146 Vt. 61, 65, 499 A.2d 422, 425 (1985) ("[T]he relationship between a clinical therapist and his or her patient is sufficient to create a duty to exercise reasonable care to protect a potential victim of another's conduct." (quotation omitted)). When a special relationship is found, such as when a parent relinquishes the supervision and care of a child to an adult who agrees to supervise and care for that child, some courts have held that the supervising adult must discharge that duty with reasonable care. See *Kellermann v. McDonough*, 684 S.E.2d 786, 790 (Va. 2009). But here, there is no evidence that Kayla ever agreed to supervise and care for Alex or that the parents of Alex ever relinquished or sought to relinquish supervision of Alex to Kayla.

As the trial court noted, "This was a case of two high school friends sneaking out together, unbeknown to either of their parents; not a situation where an adult agrees to care for another's child. Kayla did not become Alex's keeper simply because Kayla was 18 years old and Alex was not." We affirm the trial court's decision on this issue.

¶ 16. Plaintiff's remaining arguments are directly predicated on the existence of a duty binding Kayla to Alex. The trial court, however, noted that the wrongful death claim required further analysis because "a separate duty exists as to suicide." We address this issue to provide guidance to the trial bench in the future and to affirm the trial court's reasoning in this case.

¶ 17. Plaintiff argues that her daughter's death was the direct result of the sexual encounter the night before — an encounter for which we decline to hold Kayla responsible. Generally speaking, voluntary suicide is viewed as an independent intervening act that breaks the causal chain and severs potential liability. *McKane v. Capital Hill Quarry Co.*, 100 Vt. 45, 47, 134 A. 640, 641 (1926) ("[W]hen the suicide is the result of a voluntary, wilful choice, with knowledge of the purpose and physical effect of the act, a new and independent agency intervenes . . . [and] breaks the chain of causation . . . ."); see *Mikell v. Sch. Admin. Unit #33*, 972 A.2d 1050, 1054 (N.H. 2009) ("[T]he act of suicide breaks the causal connection between the wrongful or negligent act and the death." (quotation omitted)). This is because the act of suicide is considered to be a deliberate, intentional, and intervening act, which precludes a finding that a given defendant is, in fact, responsible for the harm. *Maloney v. Badman*, 938 A.2d 883, 886 (N.H. 2007). However, when an injured person becomes insane, even temporarily, and that insanity prevents one from realizing the nature of one's act or controlling one's conduct, a resulting sui-

cide is regarded either as a direct consequence of the injury and not an intervening force or as a normal consequence of the injury inflicted. W. Keeton et al., Prosser and Keeton on Torts § 44, at 310-11 (5th ed. 1984); accord *McKane*, 100 Vt. at 47, 134 A. at 640; see also Restatement (Second) of Torts § 455 (discussing "acts done during insanity caused by negligent conduct").

¶ 18. Here, there was no evidence of an uncontrollable impulse on Alex's part to commit suicide. It was uncontroverted that Alex threatened to commit suicide numerous times in the weeks before her death. On one occasion, Alex went into detail with her boyfriend about how she planned to take her own life. She spoke about suicide with her mother. On the night of her suicide, she sent text messages to her friends in which she talked about being in trouble with her parents and told her friends goodbye. Then, while sober, she carried out her suicide plan. This is not evidence of an "uncontrollable impulse," but rather of a voluntary, deliberate, and tragic choice by a girl who knew the purpose and the physical effect of her actions.

¶ 19. A number of jurisdictions have recognized an additional exception to the general rule limiting liability in the event of a suicide, holding that liability exists because the defendant had a duty to prevent the suicide arising from the defendant's special relationship with the suicidal individual. See, e.g., *English v. Griffith*, 99 P.3d 90, 94 (Colo. App. 2004) (listing cases and stating that "[s]pecial relationships typically involve circumstances in which the defendant either had a treating or supervisory relationship with the decedent or maintained custodial control over the decedent's environment"). Typically, the defendant in these cases "is someone who has a duty of custodial care, is in a position to know about suicide potential, and fails to take measures to prevent suicide from occurring." *Mikell*, 972 A.2d at 1054 (quotation omitted); cf., e.g., *Nally v. Grace Cmty. Church*, 763 P.2d 948, 956-58 (Cal. 1988) (refusing to extend special relationship duty to prevent suicide to nontherapeutic counselor in part because such relationship occurred outside custodial environment). This duty has been imposed on institutions with control over the persons, such as jails, see *Murdock v. City of Keene*, 623 A.2d 755, 756 (N.H. 1993), and mental hospitals, see *Maloney*, 938 A.2d at 890-91 (listing cases), and in limited cases on psychiatrists and other trained professionals who have the expertise or training to enable them to detect mental illness and/or the potential for suicide and the power or control necessary to prevent that suicide. See *Kockelman v. Segal*, 71 Cal. Rptr. 2d 552, 557 (Ct. App. 1998). Plainly, this exception does not apply here. As we have found, the relationship between Alex and Kayla did not give rise to any "special relationship" that would impose a duty of care on Kayla. Further, while there was substantial evidence that Alex had been expressing suicidal ideation for some time, long before she had sex at the apartment, there was no evidence Kayla knew Alex was suicidal. Alex, for her own reasons, chose to end her life. Nothing Kayla did or did not do played a part in that decision. We affirm the grant of summary judgment.

*Affirmed.*