2012 ME 43

### ESTATE OF Kristin CUMMINGS

v.

### James DAVIE et al.

Supreme Judicial Court of Maine.

Argued: Jan. 10, 2012.
Decided: March 27, 2012.

Edward L. Dillworth III, Esq. (orally), Dow's Law Office, P.A., Norway, for appellant Estate of Kristin Cummings.

Elizabeth A. Germani, Esq. (orally), Germani Martemucci Riggle & Hill, Port-land, for appellees James Davie and Jadzia Davie.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

JABAR, J.

[¶ 1]  The Estate of Kristin Cummings (Estate) appeals from a summary judgment entered in the Superior Court (Oxford County, *Clifford, J.*) in favor of defendants James and Jadzia Davie. The Estate argues that the court erred as a matter of law by declining to extend a duty of care to the Davies, Kristin's parents, to prevent or inhibit Kristin from committing suicide in circumstances where, after becoming despondent and seeking medical help, Kristin was discharged from a hospital and stayed at their home. We disagree and affirm.

## I.  BACKGROUND

[¶ 2]  We review the summary judgment record in the light most favorable to the Estate as the non-moving party. *Estate of Cilley v. Lane*, 2009 ME 133, ¶ 2, 985 A.2d 481.

[¶ 3]  The record establishes that Kristin Cummings, at the time of her death, was the twenty-five-year-old daughter of the defendants, James and Jadzia Davie. Kristin was married to Mitchell Cummings, and the couple had two young children—ages ten months and three years. Kristin had not lived with her parents since 2004, when she married Mitchell Cummings.

[¶ 4]  Kristin committed suicide in her parents' home in the early morning of October 10, 2008—approximately thirty-six hours after she had been discharged from Stephens Memorial Hospital. On October 8, 2008, two days before her suicide, Kristin arrived at Stephens Memorial Hospital

and presented as an "emotionally ... very sad" and "depressed" young woman. Over the course of approximately five hours, from 2:40 p.m. until she was discharged at 7:25 p.m., both medical and crisis care providers attempted to assess Kristin's mental and emotional stability. During the inquiry, Kristin indicated to Nurse Practitioner Dawn Decotiis that her husband, Mitchell Cummings, had inflicted what Kristin described, without much elaboration, as emotional and perhaps physical abuse on her.[1] Decotiis notified Oxford County Crisis Response (OCCR) of the abuse allegations and crisis care provider Libby Bernier–Michaud arrived at Stephens Memorial to speak with Kristin.

[¶ 5] As part of the evaluation conducted by Decotiis and OCCR, the caregivers concluded that Kristin was suffering from suicidal ideation "with no plan,"[2] consistent with a diagnosis of either postpartum depression or post-traumatic stress disorder. Decotiis recommended to Kristin that she stay in the hospital Crisis Stabilization Unit (CSU) for up to seven days. Pursuing the recommended CSU option would have allowed Kristin to receive services and care without undergoing the involuntary commitment or "blue paper" process. *See* 35–B M.R.S. § 3864 (2011) (governing involuntary commitment). Kristin indicated to Decotiis that she did not want to follow through with the recommendation to stay in CSU.

[¶ 6] Toward the end of Kristin's initial evaluation at Stephens Memorial Hospital, Decotiis impressed upon the Davies the importance of following through with aftercare plans, chiefly an appointment that had been scheduled for Kristin at 10:00

a.m. the next day with a crisis counselor at OCCR. Decotiis stressed to the Davies the importance of understanding the severity of Kristin's fragile condition. Based on the allegations of abuse Kristin had shared during the evaluation, Decotiis also recommended to Kristin that she go to the courthouse the next morning and seek a protection from abuse order against her husband. Because Decotiis did not observe Kristin to be "actively suicidal," she obliged Kristin's preference to be released from Stephens Memorial Hospital with her parents to stay at their home. Decotiis testified that she did not initiate the "blue paper" process because she did not discern from her evaluation, conducted in conjunction with OCCR's evaluation, that Kristin posed an imminent threat to herself or others.

[¶ 7] Between the late evening of October 9, 2008, and early morning of October 10, 2008, the Davies stayed with Kristin, and no one in the family was able to rest much overnight. In the early daylight hours of October 10, 2008, the Davies were speaking with Kristin in the kitchen of their home when James stepped into the living room and Jadzia went to use the bathroom. In the brief amount of time after the Davies left the kitchen, Kristin retrieved the .22 Magnum her father stored above the refrigerator and shot herself in the head. Kristin died as a result of the self-inflicted gunshot wound later that same morning.

[¶ 8] James Davie stated that he inherited the gun from his father in 1990 and kept the gun loaded, with the safety engaged, above the refrigerator for many

---

1. The present action was initially commenced by Mitchell Cummings as the Personal Representative of the Estate of Kristin Cummings. During the course of the litigation, another individual has been substituted as personal representative of the estate.

2. NP Decotiis clarified in her deposition testimony that suicidal ideation "with no plan" generally describes a person who has suicidal thoughts, feelings, or expressions, but is not "actively suicidal."

years after the family found an intruder in their home. James Davie also stated that he checked to see if the .22 Magnum was loaded on October 8, 2008, because Kristin had relayed to him that "Mitch[ell] had threatened to kill [the] entire family if [she] left him."

## II. DISCUSSION

[¶ 9] "We review an entry of summary judgment for errors of law, viewing the evidence in the parties' statements of material facts and any record references therein in the light most favorable to the party against whom the judgment was entered . . . ." *Estate of Cilley*, 2009 ME 133, ¶ 10, 985 A.2d 481 (quotation marks omitted). "[A] plaintiff who brings a cause of action for negligence must establish a prima facie case that the defendant owed him a duty of care, the defendant breached that duty, and the breach was a proximate cause of some injury to the plaintiff." *Id.* (citing *Addy v. Jenkins, Inc.*, 2009 ME 46, ¶ 8, 969 A.2d 935). The issue in this case, as in *Estate of Cilley*, is whether the Davies owed their daughter a duty of care to prevent her self-injurious behavior. *See id.* ¶¶ 4–7, 12, 16. "The determination of whether a duty exists is a question of law that we review de novo." *Radley v. Fish*, 2004 ME 87, ¶ 6, 856 A.2d 1196. The Estate argues that certain predicate facts establish a factual dispute about whether a relationship existed between Kristin and her parents such that the law would impose upon the Davies a duty to prevent or inhibit their daughter's suicide.

[¶ 10] We have previously recognized the general rule that "a party does not have an affirmative duty to aid or warn another person in peril unless the party created the danger or the two people had a special relationship that society recognizes as sufficient to create the duty." *Estate of Cilley*, 2009 ME 133, ¶ 17, 985 A.2d 481.[3] Consistent with this principle, we have acknowledged that "[c]ertain narrowly defined, special relationships give rise to an affirmative duty to aid and protect, such as the relationship between a common carrier and passenger, employer and employee, parent and [minor] child, or innkeeper and guest." *Id.* (footnotes omitted); *see also* Restatement (Second) of Torts § 314A & cmts. a–f (1965) (describing the types of special relationships generally recognized at common law and by the drafters of the Restatement). The types of special relationships we have recognized previously are not implicated on the facts of this case, and we decline to recognize a new special relationship that would impose a duty on the defendants in the circumstances presented here. *See Estate of Cilley*, 2009 ME 133, ¶ 18, 985 A.2d 481.

[¶ 11] Although the Davies voluntarily assumed care of their adult daughter, allowed her to stay at their home, and attempted to monitor her condition in the days following her discharge from Stephens Memorial Hospital, they were not medical professionals, nor were they law enforcement officials subject to a duty to keep her in their custody. The temporary care and living arrangement that the Da-

---

**3.** Courts in other jurisdictions have also held that, barring a special duty such as that recognized in a jailor-inmate or psychiatrist-patient relationship, there is no duty to prevent suicide by an adult. *See, e.g., Mikell v. Sch. Admin. Unit # 33*, 158 N.H. 723, 972 A.2d 1050, 1054 (2009) (finding that in general there is no liability for a suicide unless defendant caused it or had a specific duty of care to prevent it); *Johnstone v. City of Albuquerque*, 140 N.M. 596, 145 P.3d 76, 81–82 (App.2006) (explaining that "special relationships" giving rise to a duty to prevent a suicide usually involve relationships such as mental health professional and patient or where there is direct control and custody); *Lenoci v. Leonard*, 21 A.3d 694, 700–01 (Vt.2011) (noting that the duty to prevent the suicide of a person in custodial care has been limited to institutions with control over that person).

vies agreed to provide did not impose upon them a legal duty to prevent Kristin, a competent adult who had been evaluated by medical personnel and crisis workers and deemed not to be a danger to herself or others, from harming herself.[4]

[¶ 12]   Because we hold that no special relationship existed between Kristin and her parents, either by virtue of those special relationships that we have previously recognized in our duty of care jurisprudence or by the existence of a custodial relationship, we affirm the court's summary judgment.

The entry is:

Judgment affirmed.

---

4.   We are also not persuaded, considering the gravity of the social policy implications and the unique, albeit tragic, circumstances that precipitated this litigation, that the standalone provisions found in sections 323 (Negligent Performance of Undertaking to Render Services) and 324 (Duty of One Who Takes Charge of Another Who is Helpless) of the Restatement should guide the duty analysis we undertake here. *See* Restatement (Second) of Torts §§ 323–24 (1965).