Filed 08/20/25

VERMONT SUPERIOR COURT
Rutland Unit
83 Center St
Rutland VT 05701
802-775-4394
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 24-CV-01627

---

Catherine Feger v. Val Roc Corporation, et al

---

## DECISION ON THE MERITS

This is a negligence and consumer protection action brought by Catherine Feger against the Val Roc Corporation. The court held a bench trial on August 5, 2025. Plaintiff was represented by Attorney Nicholas Seldon and Defendant was represented by Attorney Frank Urso.

### Findings of Fact

The court makes the following findings of fact by a preponderance of the evidence. The Val Roc Corporation operates the Val Roc Motel in Killington, Vermont. The Motel is 0.63 miles from the Killington Skyeship, a gondola located at the Killington Resort. The Motel advertises through the website www.valroc1.wixsite.com/valroc1. On this website, the Motel states it is "Located at the Killington Skyeship." The website shows two pictures in a perpetual loop: one of the Skyeship and one of the Motel's pool and tennis court. The Skyeship is not walkable from the Motel, especially during the winter. The Motel offers rooms on a nightly basis, as well as through long term leases. No smoking is allowed at the Motel and no pets are allowed in the common areas. Daniel Farbman is the President of the Val Roc Corporation. His wife, Sandra Farbman is an officer of the corporation. Mr. Farbman handles the day-to-day operation of the Motel.

Jason Sasbon is an individual who has resided at the Motel since 2021. On or about May 15, 2023, Mr. Sasbon entered into a written lease agreement with the Val Roc Corporation for Room 24 at the Motel. Ex. B.[1] The lease was for one year and required Mr. Sasbon to pay a weekly rent of $200. *Id.* The lease contained the following term: "Pets: permitted to have only one pet and restricted to medium size and weight." *Id.* Mr. Farbman considered a dog less than 100 pounds to be a medium sized dog. In March of 2024, Mr. Sasbon kept two large dogs in his room in violation of his written lease. Prior to March 23, 2024, Mr. Farbman was aware Mr. Sasbon had the two large dogs in his room, was aware they were not supposed to be there, and made no attempts to remove the dogs from the Motel or otherwise enforce the terms of the lease. The Motel hired Mr. Sasbon to do general maintenance around the Motel. Neither Mr. Farbman, nor anyone at the corporation, attempted to enforce the terms of terms of the lease or any rules at the Motel.

---

[1] Plaintiff raised a question regarding the validity of this lease given Mrs. Farbman submitted a lease signed by the parties on a different date. Regardless of which lease is valid, the term governing pets is the same across both leases.

Catherine Feger is a resident of Sleepy Hollow, New York and is employed as a nurse. Ms. Feger, along with her sister Marianna Feger, decided to come to Vermont the weekend of March 23, 2024 for a sister ski trip. Marianna Feger looked up hotels on booking.com and located the Val Roc Motel. Prior to booking rooms, Catherine Feger looked at the Val Roc Motel's website. Based upon what she saw, she believed the motel was a mom-and-pop motel for skiers. The weather forecast for the weekend called for two feet of snow at Killington. She believed it would be difficult to get a taxi or Uber during the snowstorm. She saw that the website stated it was "at" the Skyeship and thought that would be ideal because of her concerns about being able to drive during the snowstorm. She believed the motel was within walking distance of the Skyeship based upon the word "at" on the website. After reviewing the website, Catherine Feger agreed her sister should book two nights at the Motel. Marianna Feger booked and paid for two nights at the Val Roc Motel through booking.com for $425. The Motel has advertised being "at" the Skyship since 1997 and has had no complaints from guests over the use of the word "at" prior to the Fegers.

On Friday, March 22, 2024, Catherine Feger got out of work around 8:00 p.m. Her sister picked her up and they drove to the Val Roc Motel. The trip took approximately three hours and was an easy drive. The Fegers drove past the Skyeship in order to get to the Motel. Upon arrival, there was no one at the check-in desk. The Fegers located a post-it note on the check-in desk with their last name and a room number. In addition, there was a sign that had a number to call for after hours. Catherine Feger called and texted the number, but there was no response from Mr. Farbman. The Fegers went to their room and found it unlocked with the key on the nightstand. The room stank of cigarette smoke and the lock on the door did not work. The Fegers left the room door open in attempt to air out the room while deciding what to do. Mr. Sasbon walked past the door and peeked his head in, muttering to himself. The Fegers did not feel safe and decided to leave and find alternative housing.

The Fegers spent one and one-half hours looking for different lodging. They stopped at every motel, hostel, and hotel they saw in Killington and along the road to Rutland. They were unable to find alternative lodging in either Killington or Rutland that evening because everyplace was booked up. The sisters returned to the Val Roc Motel around 12:30 a.m. Marianna Feger suggested they sleep in the car, however Catherine Feger recommended they make do and just sleep in motel room. When they arrived at the Motel the second time, they heard dogs barking like crazy. Marianna Feger exited their vehicle and opened the door to the room in an attempt to air it out again. Catherine Feger stayed in the vehicle to change into pajamas.

Once Catherine Feger finished changing, she exited the vehicle and closed the vehicle's door. A huge bull mastiff ran out to a post that was in front of the motel room. The dog ran up to Catherine Feger barking and growling. It started biting her and she screamed. A second large dog came around from the front of the vehicle. The two dogs circled Ms. Feger and knocked her to the ground. The dogs bit Ms. Feger on both knees, her arm, and her back. Marianna Feger saw the dog attack and saw Mr. Sasbon standing outside, not doing anything to stop the attack. She yelled at Mr. Sasbon to get the dogs. He proceeded to distract the dogs enough for Catherine Feger to stand up and retreat to the vehicle. Marianna Feger called 911 and was told due to the storm, first responders would not be

coming. Both Feger sisters attempted to get information form Mr. Sasbon about his identity and his dogs. They were unsuccessful.

Marianna Feger drove her sister to the Rutland hospital. During the trip, the vehicle spun out due to the poor weather conditions, but did not go off the road. At the hospital, Catherine Feger was treated with a warm blanket. The hospital gave her lidocaine shots into the left knee in order to clean and suture the dog bite wounds. In addition, the hospital gave her a painful rabies shot. After receiving treatment, Catherine Feger was discharged. The sisters returned to the Motel to take pictures of license plates before returning to Rutland to find lodging. The sisters were able to obtain a room at the Comfort Inn in Rutland due to a no-show. The following morning, the sisters had a phone conversation with Mr. Farbman. He admitted he knew the dogs were not supposed to be at the Motel and he knew the dogs were there despite that. The sisters told Mr. Farbman that the dogs were aggressive and he agreed with that statement.

Catherine Feger received follow-up medical care back in New York. She went to urgent care three times. She received additional rabies shots and had to go to orthopedics to get her sutures removed. She experienced significant discomfort and pain. As a result of the dog attack, incurred $14,964.77 in medical expenses. In addition, she lost the ability to work for three weeks. Given the nature of her job as a nurse and the concerns about the type of injuries she received, her doctor precluded her from working for three weeks. She immediately returned to work as soon as she was able. At the time, Ms. Feger worked 37.5 hours a week and earned $63.25 per hour. Her total lost wages were $7,115.62.

There has been a significant impact on Ms. Feger as a result of the dog attack. During the attack itself, Ms. Feger was terrified and scared. She was hyperventilating and in shock. She had substantial physical pain from the injuries. Ms. Feger has her own dog and used to enjoy when her dog interacted with other dogs. Now she is terrified of all other dogs. When she sees other dogs walking by, she freezes and will stand by a safe place, such as a tree. She carries a baton and pepper and/or bear spray as a result of the attacks in order to feel safe. March 23, 2024 was the worst day of Ms. Feger's life.

Mr. Farbman agrees Ms. Feger has a right to be safe at the Motel and the Motel is obligated to comply with state law.

## Conclusions of Law

The Plaintiff has asserted three claims against the Defendant: (1) Negligence, (2) Negligent Infliction of Emotional Distress, and (3) A Violation of the Consumer Protection Act. Each claim will be addressed separately.

### *Plaintiff's Claim of Negligence*

"To support a negligence claim, a plaintiff must show that the defendant owed the plaintiff a duty that was breached, which proximately caused injury to the plaintiff." *LeClair v. LeClair,* 2017 VT 34, ¶ 10, 204 Vt. 422. In this case, Plaintiff has asserted two theories of negligence. First, Plaintiff

argues Defendant was negligent because Mr. Farbman knew Mr. Sasbon's dogs were dangerous and allowed them to remain on the property. Second, Plaintiff argues Defendant was negligent because the corporation failed to enforce the terms of the lease agreement that prohibited Ms. Sasbon from having more than one medium sized dog.

1. *Plaintiff's First Theory of Negligence*

Under Vermont law, dogs are generally considered useful and are usually harmless. *Martin v. Christman,* 2014 VT 55, ¶ 8, 196 Vt. 536. "Under Vermont law, ordinary domestic dogs are not considered to be an unreasonable risk to the public." *Gross v. Turner,* 2018 VT 80, ¶ 12, 208 Vt. 112. However, an owner of a dog may be liable for injuries caused by a dog bite if the owner knows the dog has vicious tendencies. *Martin,* 2014 VT 55, ¶ 7. A dog owner "is not liable for injuries to persons and property unless the owner had some reason to know the animal was a probable source of danger." *Davis v. Bedell,* 123 Vt. 441, 442-3 (1963). The law does require evidence of a prior attack in order to prove a dog has vicious tendencies. *Martin,* 2014 VT 55, ¶ 7. Similarly, "a landlord owes a duty to take reasonable steps to protect persons outside the land from injuries caused by a tenant's dog if the landlord knew or had reason to know at the time of entering the lease that the dog in question posed an unreasonable risk of harm to such persons." *Gross,* 2018 VT 80, ¶ 12. This obligation "arises from the fact that the landlord has some control over the activities of the tenant, in that the landlord decides whether to rent to the tenant in the first place, renew or terminate the tenancy, or to impose conditions in the lease." *Id.* at ¶ 13. This obligation extends to injuries caused in common areas the landlord has control over. *Restatement (Second) of Torts* § 359; *Higgins v. Bailey,* 2021 VT 74, ¶ 15, 215 Vt. 461.

In order for the Val Roc Corporation be liable for Ms. Feger's injuries under this theory, "the plaintiff must show that the landlord had actual knowledge of facts that would alert a reasonable person to the dog's vicious propensities." *Gross,* 2018 VT 80, ¶ 18. Furthermore, "[i]t does not create an obligation on the part of the landlord to actively inquire into the dog's history before permitting it to reside on the premises." *Id.* Specific warnings to a landlord about a tenant's dog is sufficient to meet this burden. *Bradley v. Bradley,* 2020 WL 3046141, *3 (Vt. June 5, 2020) (unpub. mem.). "Evidence tending to demonstrate a dog's vicious propensities includes evidence of a prior attack, the dog's tendency to growl or snap or bare its teeth, the manner in which the dog was restrained, the fact that the dog was kept as a guard dog, and a proclivity to act in a way that puts others at risk of harm." *Ioveno v. Schwartz,* 32 N.Y.S.3d 297 (N.Y. App. Div. 2016).

Here, Plaintiff has presented no evidence Mr. or Mrs. Farbman knew Mr. Sasbon's dogs had vicious propensities. The Farbmans denied any knowledge of the dogs' viciousness. Although Chief Whitman testified he had heard the dogs barking, there was no evidence when he heard the dogs barking. Furthermore, a barking dog is not in and of itself sufficient to show vicious propensities since all dogs bark. There were no prior reports of the dogs attacking either people or other animals. The Plaintiff has not proven the Defendant had knowledge of the dogs' vicious tendencies. As such, the Plaintiff has not met her burden under this theory.

2. *Plaintiff's Second Theory of Negligence*

Plaintiff also argues that, regardless of whether the Val Roc Corporation knew of the vicious propensities of the dogs, the Corporation was still negligent because Mr. Farbman knew that the dogs were in the motel in violation of the lease agreement it had with Mr. Sasbon, and did nothing to enforce the lease agreement against him. Plaintiff reasons that, but for this non-enforcement, the dogs who injured her would not have been there at all when Plaintiff arrived that fateful evening.

The court has found no Vermont caselaw squarely addressing the negligence liability of a landlord or property owner to a landlord's tenant or guest who was injured by dog bite that would have been prevented by the landlord's enforcement of "no pets" (or similar) lease condition against other tenants/lessors. Courts from other jurisdictions, however, have held that, while such lease clauses may give landlords sufficient control for removing pets and animals from the premises, a duty to protect others from harm by an animal on the premises does not arise unless the landlord also knows or has reason to know "that the animal is dangerous and presents an unreasonable risk of harm." *Amyotte ex rel. Amyotte v. Rolette Cnty. Hous. Auth.*, 2003 ND 48, ¶ 11, 658 N.W.2d 324 (citing *Matthews v. Amberwood Assocs. Ltd. P'ship*, 719 A.2d 119, 125-32 (Md. 1998) and *Braun v. York Props., Inc.*, 583 N.W.2d 503, 508 (Mich. Ct. App. 1998) (pet-size restrictions in lease did not impose duty upon landlord to protect others from harm caused by pets exceeding size restriction)); *see also* Danny R. Veilleux, Annotation, "Landlord's liability to third person for injury resulting from attack on leased premises by dangerous or vicious animal kept by tenant," 87 A.L.R.4th 1004, § 2[a] (1991) ("The general rule regarding the liability of a landlord to a third person for an attack by a tenant's animal on the leased premises appears to be that the landlord is not liable unless the landlord had knowledge of the animal's presence and its dangerous tendencies, and had control of the premises or otherwise had the ability to eliminate the danger by having the animal removed or confined[.]").[2]

Moreover, in *Higgins*, a case concerning a landlord's liability to a *tenant's* guest—rather than a tenant or guest of the landlord—the Vermont Supreme Court, after analyzing a handful of pertinent cases (including *Matthews v. Amberwood*, *supra*), summarized the law in this area as follows:

> Two factors are critical to the courts' analyses in those cases in which courts have held that a landlord can be liable to a tenant's guests: (1) *the landlord has had actual knowledge of the tenant's dangerous animal*, and, (2) the landlord has had the legal ability to mitigate the risk, either because the landlord had knowledge prior to the inception of the tenancy or because, through the lease, the landlord retained control of the tenant's use of the property to keep domestic animals.

*Higgins*, 2021 VT 74, ¶ 17 (emphasis added). Indeed, that a landlord's duty of care in this context is founded on *both* (1) knowledge of the dangerous tendencies of the animal *and* (2) the landlord's ability to mitigate or eliminate the risk of the dangerous animal (through lease enforcement or otherwise), was driven home by the Maryland Court of Appeals in *Matthews*:

> We do not hold that a landlord' retention in the lease of some control over particular matters in the leased premises is, *standing alone*, a sufficient basis to impose a duty upon the landlord which is owed to a guest on the premises. . . .

---

[2] This *American Law Reports* annotation has been updated since 1991, and, for example, addresses *Higgins v. Bailey*, 2021 VT 74 and *Gross v. Turner*, 2018 VT 80, in its analysis.

[W]here a landlord retained control over the matter of animals in the tenant's apartment, *coupled with* the knowledge of past vicious behavior by the animal, the extremely dangerous nature of pit bull dogs, and the foreseeability of harm to persons and property in the apartment complex, the jury was justified in finding that the landlord had a duty to the plaintiff and that the duty was breached.

719 A.2d at 129, 131-32 (emphasis added).

Here, for reasons discussed above, Plaintiff has failed to prove that Defendant had knowledge of the dangerous propensities or risks posed by the dogs kept by Defendant's tenant, Mr. Sasbon. Accordingly, while Defendant may have had enough *control*, through the lease agreement with Mr. Sasbon, to prevent the dogs from being there and injuring other tenants such as Plaintiff, Defendant had no duty of care under the circumstances because Defendant lacked knowledge of the dogs' dangerous propensities.

Because the Plaintiff has not met her burden on either theory of negligence, judgment must be entered for the Defendant.

*Plaintiff's Claim for Negligent Infliction of Emotional Distress*

Plaintiff also asserts a claim for negligent infliction of emotional distress. That claim is "premised on a finding of negligence." *Taylor v. Fletcher Allen Health Care*, 2012 VT 86, ¶ 15, 192 Vt. 418 (citing *Lenoci v. Leonard,* 2011 VT 47, ¶ 9, 189 Vt. 641 (mem.)). Thus, where a "plaintiff cannot make out a claim for negligence[,] her claim for negligent infliction of emotional distress necessarily fails too." *Id.* Here, as Plaintiff did not meet her burden on her negligence claims, her claim for negligent infliction of emotional distress also necessarily fails.

*Plaintiff's Consumer Protection Act Claim*

The purpose of the Vermont Consumer Protection Act (VCPA) "is to protect this state's citizens from unfair and deceptive business practices and to encourage a commercial environment highlighted by integrity and fairness." *RSD Leasing, Inc. v. Navistar Int'l Corp.,* 2024 VT 33, ¶ 6, 319 A.3d 734 (citations and quotations omitted). Ms. Feger brought this claim alleging the Val Roc Corporation engaged in deceptive business practices in how the Motel was advertised on its website. The VCPA prohibits "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce." 9 V.S.A. § 2453. "To sustain a consumer-protection claim, a plaintiff must (1) prove facts that meet the definition of an unfair or deceptive act under 9 V.S.A. § 2453(a), and (2) demonstrate the prerequisites to a private action under 9 V.S.A. § 2461(b)." *Mansfield v. Heilmann, Ekman, Cooley & Gagnon, Inc.,* 2023 VT 47, ¶ 32, 218 Vt. 359.

In order to prove an act was deceptive under the VCPA, Ms. Feger must show "(1) the representation or omission at issue was likely to mislead consumers; (2) the consumer's interpretation of the representation was reasonable under the circumstances; and (3) the misleading representation was material in that it [was likely to] affect[ ] the consumer's purchasing decision." *Id.* at ¶ 34

24-CV-01627 Catherine Feger v. Val Roc Corporation, et al

(citations and quotations omitted). Furthermore, in order to bring a private action under the VCPA, Ms. Feger must "show either (1) reliance on a deceptive act in contracting for goods or services or (2) damages or injury from an unfair or deceptive act." *Dernier v. Mortg. Network, Inc.,* 2013 VT 96, ¶ 56, 195 Vt. 113; *see also Mansfield,* 2023 VT 47, ¶ 34 (party suing on theory of reliance in contracting need not prove injury and the allowable recovery is the consideration paid, attorney's fees, and exemplary damages, and party suing for injury or damages must prove causation and injury).

In this case, the crux of Plaintiff's claim is that the Val Roc Corporation was deceptive in advertising the Motel being located "at" the Killington Skyeship, when in fact it is located 0.63 miles from the Skyeship. The word "at" has multiple definitions. The Merriam-Webster Online Dictionary has six separate definitions for the word "at." At, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/at. The first definition is "used as a function word to indicate presence or occurrence in, on, or near." *Id.* This is consistent with the definition found in Webster's New World Dictionary, 3rd College Edition, testified about during Mr. Farbman's testimony. Ms. Feger argues that the use of the word "at" is deceptive because the Motel is not in or on the Skyeship and 0.63 miles is not close enough to be "near" the Skyeship. The court disagrees. The term near does not require a specific distance before something is no longer near. The use of the term "at" to describe something near the Skyeship is not inherently deceptive. Moreover, Ms. Feger and her sister are the first customers to complain the use of the word "at" was misleading in over twenty-five years the Val Roc Corporation has advertised it was located "at" the Killington Skyeship. This track record indicates the term "at" was not likely to mislead customers.

In any event, Ms. Feger has not shown that "at," assuming it was likely to mislead consumers, was relied upon by Ms. Feger in contracting for any goods or services, or that Ms. Feger suffered injuries as a result of the deceptive act. *See Dernier,* 2013 VT 96, ¶ 56. The record shows that Ms. Feger's sister booked and paid for lodging at Val Roc, not Ms. Feger, so Ms. Feger did not engage in contracting for goods or services, due to an allegedly deceptive act. *See Wilder v. Aetna Life & Cas. Ins. Co.,* 140 Vt. 16, 19 (1981) (private action under 9 V.S.A. § 2461(b) unavailable where plaintiff was not a purchaser of the alleged good or service). Plaintiff also failed to show that she suffered injuries as a proximate result of the allegedly deceptive act. Here, Plaintiff's injuries from the dog attack were not proximately caused by any acts of Defendant that allegedly misled Ms. Feger and/or her sister into the belief that the motel was substantially closer to the Killington Skyeship gondola than it actually was.

Ms. Feger also argues that the Val Roc Corporation was deceptive in that it advertised as a mom-and-pop motel for skiers. Ms. Feger argues this advertising was misleading because the lock on her room door did not function, the room smelled of cigarettes, and the motel allowed dogs to reside on the premises. However, Ms. Feger did not testify that the website stated there were no dogs allowed, or that she relied upon the website and picked the Val Roc Motel because it advertised locking doors or cigarette-free rooms. As such, it does not appear that the "mom and pop motel" advertising was likely to mislead consumers or affect a purchasing decision of a reasonable consumer.

Moreover, as noted above, Ms. Feger did not make the motel booking or pay for the lodging. Thus, Ms. Feger was not a contracting party. Further, she has not shown injuries or damages proximately caused by Val Roc's website indicating that the motel was a mom and pop motel for

skiers, even assuming that such advertising was false or deceptive. The court does not find that "mom and pop motel" in advertising connotes "no pets" or no animals on the premises. "Mom and pop" most naturally suggests an owner-operated establishment, or an establishment that is smaller and independent, and not part of a larger "chain" of similar establishments. Advertising as "mom and pop motel" is also not a promise or assurance of safety, from dangerous conditions or risks of injury caused by the acts or omissions of other tenants that were not actually or reasonably known to be dangerous or risky by the motel owner (Defendant).

Conclusion

For the foregoing reasons, the Plaintiff has not met her burden in this case. Judgment will be entered for the Defendant.

Electronically signed on August 20, 2025 pursuant to V.R.E.F. 9(d)

_____
Alexander N. Burke
Superior Court Judge

Electronically Signed Pursuant to V.R.E.F. 9(d)

_____
Dave Wolk
Assistant Judge
Vermont Judiciary